UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | S4 19 Cr. 144 (AKH) |
| v. | |
| VICTOR MONES CORO, | |
| *Defendant*. | |

## **DEFENDANT VICTOR MONES CORO'S SENTENCING MEMORANDUM**

CHRISTINE H. CHUNG PLLC
Christine H. Chung
14 Murray Street, #236
New York, New York 10007
(917) 685-0423

PERRY GUHA LLP
Samidh Guha
George M. Barchini
35 East 62nd Street
New York, New York 10065
(917) 674-5383

Attorneys for Victor Mones Coro

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ...........................................................................................................6

I.  Mr. Mones' Personal History And Characteristics Are Exceptional ..................6

    A.  Mr. Mones' Personal History.................................................................6

    B.  Mr. Mones' Characteristics...................................................................8

        1.  Mr. Mones' Devotion To His Family ........................................8

        2.  Mr. Mones' Kindness And Generosity Toward Others ..............9

        3.  Mr. Mones' Good Character, Responsible Nature, And
            Work Ethic .................................................................................10

        4.  Mr. Mones' Exemplary Conduct And Work In Prison............11

        5.  Mr. Mones' Long Commitment To Charitable Acts ................12

II.  The Nature And Circumstances Of The Offense Weigh Against A Term
    Of Incarceration Of Longer Than 28 Months' Imprisonment ...........................13

III.  The Court Should Reject The Guidelines Range Predicated On Applying
     A Leadership Enhancement ..............................................................................17

    A.  The Guidelines Range Calculated By The USPO..................................17

    B.  The Objection To Imposition Of A Leadership Enhancement ..............18

IV.  The Court Should In Any Event Vary Downwardly From The Guidelines
     Range And Impose A Sentence Of 28 Months' Imprisonment .........................22

    A.  A Sentence Of Longer Than 28 Months' Imprisonment Would
        Create Unwarranted Sentencing Disparity............................................22

    B.  Numerous Other Factors Demonstrate That A Sentence of 28
        Months' Imprisonment Is Ample To Serve The Purposes of
        Sentencing..............................................................................................27

        1.  Mr. Mones ████████████████████████
            ████████████████████████████
            ████████ ................................................................27

2.      The Conditions Of Mr. Mones' Confinement Have Been
        Extreme And Included Contracting COVID-19 At The
        MCC ...................................................................................................29

3.      Mr. Mones Helped To Expose That Mr. Marin, The Long-
        time Confidential Source, Was Unreliable ................................................31

4.      Mr. Mones Suffered The Extraordinary Burdens Of The
        Government's Sixteen Late Discovery Productions .................................33

CONCLUSION ...........................................................................................................34

# TABLE OF AUTHORITIES

## Cases

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006) ..................................................................... 6

*United States v. Aracena de Jesus*,
  No. 20-cr-19-PAE (S.D.N.Y. July 1, 2020) (Sent. Tr.) ................................ 5, 30, 31

*United States v. Atilla*,
  No. 15-cr-867-RMB (S.D.N.Y. Feb. 7, 2018), ECF No. 493 (Decision and
  Order) .................................................................................................................. 3, 25

*United States v. Atilla*,
  No. 15-cr-867-RMB (S.D.N.Y. May 16, 2018), ECF No. 520 (Sent. Tr.) ............. 3, 20, 24-25

*United States v. Burgos*,
  324 F.3d 88 (2d Cir. 2003) ...................................................................................... 19

*United States v. Caballero*,
  93 F. Supp. 3d 209 (S.D.N.Y. 2015) ....................................................................... 19

*United States v. Carrillo Berber*,
  No. 18-cr-703-PAC (S.D.N.Y. June 11, 2020), ECF No. 28 (Sent. Tr.) ................ 31

*United States v. Carty*,
  264 F.3d 191 (2d Cir. 2001) .................................................................................... 29

*United States v. Casillas*,
  No. 19-cr-863-VLB (S.D.N.Y. Dec. 20, 2019), ECF No. 10 (Memo
  Endorsement) .......................................................................................................... 31

*United States v. Casillas*,
  No. 19-cr-863-VLB (S.D.N.Y. May 4, 2020), ECF No. 27 (Sent. Tr.) ................... 31

*United States v. Cirino*,
  No. 19-cr-323-JSR (S.D.N.Y. July 17, 2020) (Sent. Tr.) ................................... 5, 31

*United States v. Elashyi*,
  554 F.3d 480 (5th Cir. 2008) ................................................................................... 22

*United States v. Espinal*,
  No. 19-cr-622-DLC (S.D.N.Y. Aug. 6, 2020), ECF No. 54 (Sent Tr.) ................... 31

*United States v. McKeeve*,
   131 F.3d 1 (1st Cir. 1997) ................................................................. 22

*United States v. Mcrae*,
   No. 17-cr-643-PAE, 2021 WL 142277 (S.D.N.Y. 2021) ....................... 30

*United States v. Mitchell*,
   No. 13-cr-752-KPF (S.D.N.Y. Aug. 5, 2020), ECF No. 50 (Sent. Tr.) ................................. 31

*United States v. Murad*,
   954 F. Supp. 772 (D. Vt. 1997) ................................................. 19, 20

*United States v. Parsa*,
   No. 14-cr-710-RA (S.D.N.Y. May 20, 2016), ECF No. 68 (Sent. Tr.) ................................ 19

*United States v. Sanchez-Reyes*,
   No. 19-cr-502-DLC (S.D.N.Y. July 24, 2020), ECF No. 32 (Sent. Tr.) .............................. 31

*United States v. Sarvestani*,
   No. 13-cr-214-PGG (S.D.N.Y. Aug. 14, 2013), ECF No. 45 (Sent. Tr.) .................... 4, 25-26

*United States v. Toohey*,
   132 F. App'x 883 (2d Cir. 2005) ............................................... 22

## Statutes

18 U.S.C. § 3553(a) ................................................................. 34

18 U.S.C. § 3553(a)(4) ........................................................... 17

18 U.S.C. § 3553(a)(6) ........................................................... 22

21 U.S.C. § 1904(c) ................................................................. 1

21 U.S.C. § 1906(a) ................................................................. 1

21 U.S.C. § 1906(b) ................................................................ 14

## Other Authorities

*Annual Report and Sourcebook of Federal Sentencing Statistics*
   U.S. Sentencing Comm'n (2018) ................................................ 24

*Annual Report and Sourcebook of Federal Sentencing Statistics*
   U.S. Sentencing Comm'n (2019) ................................................ 24

Manual for Complex Litigation (Fourth) § 11.446
(2004) ............................................................................................................ 33

*State Sponsors of Terrorism*
U.S. Dep't of State (2021) ........................................................................... 23

**<u>Sentencing Guidelines</u>**

U.S.S.G. § 1B1.2 .................................................................................................. 17

U.S.S.G. § 2M5.1 ......................................................................................... *passim*

U.S.S.G. § 2X5.1 .................................................................................................. 17

U.S.S.G. § 3B1.1(a) .................................................................................. 17, 19, 21

U.S.S.G. § 3E1.1 .................................................................................................. 17

## PRELIMINARY STATEMENT

Victor Mones Coro is a 53-year-old husband and father, a U.S. citizen and 20-year resident of South Florida, and owner and operator of a private air charter services company, American Charter Services ("ACS").

Mr. Mones comes before the Court for sentencing deeply remorseful for having committed a very serious crime—sanctions evasion. He promptly accepted responsibility and pled guilty— first in November 2019 and again in January 2021 following late government discovery productions—to the same underlying conduct of conspiring to violate and violating the Kingpin Act[1] by brokering private air charter flights for the two lead co-defendants, Tareck Zaidan El Aissami Maddah ("El Aissami") and Samark Jose Lopez Bello ("Lopez Bello"). The Office of Foreign Assets Control ("OFAC") named those Venezuelan citizens as Specially Designated Narcotics Traffickers ("SDNTs") on February 13, 2017, and Mr. Mones provided brokering services from the United States after that date, without obtaining an OFAC license. El Aissami and Lopez Bello were respectively the former Vice-President of Venezuela and a Venezuelan businessman alleged to be a "front man" for El Aissami.

The U.S. Probation Office ("USPO") filed a report on February 16, 2021 (the "PSR"), recommending a sentence of principally 30 months' imprisonment based on its assessment of the offense conduct and Mr. Mones' personal characteristics. PSR at p. 37, ECF No. 176 (Feb. 18, 2021). We respectfully submit that a downward variance should be granted to a term of 28 months' imprisonment (approximately time served). The reasons relate to: (1) the character of Mr. Mones, who has otherwise led an honorable life and will never commit another crime; (2) the need to avoid

---

[1] *See* 21 U.S.C. §§ 1904(c)(1)-(2) and 1906(a)(1)-(2).

unwarranted sentencing disparities vis-à-vis cases involving similar sanctions evasion conduct; (3) ███████████████████████████████████████████████████████████████ ████████████████ and his help in exposing the Confidential Source as a liar; and (4) the punishments Mr. Mones has uniquely suffered already as a result of being imprisoned during COVID-19, contracting COVID-19, and the massive, late *Brady*/*Giglio* disclosures in this case.

As nearly 40 friends and family have written in a set of extraordinary letters of support, Mr. Mones' crime does not reflect his life or character. Mr. Mones is a loving and supportive husband and father who throughout his life has routinely engaged in acts of kindness and charity that bettered the lives of others. Mr. Mones has been a model inmate even in the terrible conditions of confinement of the past year. An MCC corrections officer and work supervisor have praised Mr. Mones' character and his contributions.

Mr. Mones well understands, and has learned in the harshest possible way, that his crime was grave. He helped the two lead co-defendants based in Venezuela illegally obtain private air charter services from his U.S.-based company for two years before his arrest. Contemporaneous chat chains and consensually recorded calls have laid bare the planning, deception, and concealment in which the conspirators engaged as part of evading sanctions.

Importantly, however, despite the connotations of the Kingpin Act, or the government's predictable efforts to taint Mr. Mones with the crimes and vices of the Venezuelan government and its members, the government has never alleged that Mr. Mones is or was a drug trafficker, money launderer, or transporter of contraband. Mr. Mones did none of these things. The same chats and calls that prove Mr. Mones' wrongdoing equally demonstrate him to have been a cog in the wheel of his clients' travel planning—the equivalent of a limo dispatcher or driver for the powerful co-defendants abroad. Most of the flights Mr. Mones arranged were for leisure travel.

Mr. Mones also was not enriched by his crimes. El Aissami and Lopez Bello were indebted to him for past flights and flight management services when OFAC designated them, and never paid down their debt. They are unlikely ever to be arrested.

Sentences imposed for sanctions evasion in this District and around the country make clear that a sentence of 28 months' imprisonment for Mr. Mones would be, if anything, unduly harsh. A survey of sentences imposed in all districts in a five-year period from 2015 to 2020 on defendants sentenced under U.S.S.G. § 2M5.1, the same guideline at issue here, for violations of sanctions against Iran—the most serious and commonly prosecuted sanctions offenses—reveals the average sentence to be 28.9 months, even excluding cooperating defendants. *See infra* Section IV.A and Exhibit 1 (Chart of Sentences). Because the guideline itself lacks gradation or nuance, downward variances were also nearly universal and often substantial.

In a recent case in this District that the government labeled "the biggest sanctions evasion case prosecuted in the United States that we are aware of," Judge Berman imposed a 32-month sentence upon Mehmet Hakan Atilla, a Turkish deputy bank manager convicted at trial of evading sanctions against Iran by facilitating billions in funds transfers representing revenues of the Iranian petroleum industry, for nearly five years.[2] Judge Gardephe sentenced Seyed Amin Ghorashi Sarvestani to 30 months' imprisonment, notwithstanding that he was a "highly sophisticated businessman" who for "many years" used two companies he partly owned in the United Arab

---

[2] Sentencing Transcript ("*Atilla* Tr.") at 72:14-16, 79:18-19, *United States v. Atilla*, No. 15-cr-867-RMB (S.D.N.Y. May 16, 2018), ECF No. 520; Decision and Order at 1-2, 12-13, *Atilla* (Feb. 7, 2018), ECF No. 493.

Emirates to procure and trans-ship U.S. sourced satellite equipment to Iran via Hong Kong, Malaysia, and Dubai.[3]

Unlike those defendants, Mr. Mones did not remotely mastermind a multi-year plot to send technology to a state sponsor of terrorism or lie at trial to defend making billions in illegal wire transfers. Also unlike any defendant in any other sanctions evasion case of which we are aware,

███████████████████████████████████████████████████████

████████████████████. ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████. Mr. Mones has never

claimed ███████████████████████████, but he was never disloyal to the United

States, █████████████████████████████████████████.

Mr. Mones has also provided unique assistance to the government and suffered unique punishments since his first plea of guilty.

It was as a result of questions asked by Mr. Mones last summer about the government's Confidential Source, Alejandro Javier Marin, that Mr. Marin was exposed as an unreliable liar and charged with three counts of lying to federal agents. Mr. Mones had raised questions apparent from the face of Department of Homeland Security ("DHS") reports dating from mid- 2018 but that the AUSAs and DHS agents failed to spot themselves. Mr. Mones should receive credit for

---

[3] Sentencing Transcript ("*Sarvestani* Tr.") at 22:6-21, 27:1-4, 27:20-22, 28:1-2, *United States v. Sarvestani*, No. 13-cr-214-PGG (S.D.N.Y. Aug. 14, 2013), ECF No. 45.

ensuring that neither the government nor the courts continued to rely on information furnished by a source who lied to agents and AUSAs.

Mr. Mones has also served time in conditions of confinement far harsher than ever could have been imagined at the time of his arrest.  He contracted COVID-19 last March and was seriously ill for three weeks, before he recovered of his own accord and without receiving treatment other than over-the-counter medications and "isolation" in an ice-cold cell.  For over a year now, Mr. Mones has not had a single social visit, and he has been subject to full and partial lockdowns, with the accompanying restrictions on phone and email privileges, meals, and showers.  As in other post-COVID-19 cases, the "dreadful," uncharacteristic "harshness" of confinement during "a historic millennial pandemic," which in Mr. Mones' case included the risk of "dire illness [and] death"[4] warrants leniency.

Finally, the government's *sixteen* late *Brady*/*Giglio* productions relating to Mr. Marin, in a total volume more than twice what the government timely produced in 2019, burdened Mr. Mones in a unique way.  It was both distressing and depleting of his family's limited resources for Mr. Mones to be forced to review, on 16 separate occasions, a total of 6.7 terabytes of information, all while under the limits of COVID-19 restrictions.  The equivalent of the billions of pages of discovery produced serially until fully one year after Mr. Mones' first guilty plea prompted discovery motion practice, the invalidation of Mr. Mones first plea, and Mr. Mones being forced to prepare and then re-prepare for sentencing as well.  By being compelled to revisit the evidence and "re-do" his case, Mr. Mones lost the main value of his prompt guilty plea—getting with a

---

[4] Sentencing Transcript ("*Aracena* Tr.") at 32:1-16, *United States v. Aracena de Jesus*, No. 20-cr-19-PAE (S.D.N.Y. July 1, 2020); Sentencing Transcript ("*Cirino* Tr.") at 11:9-15, *United States v. Cirino*, No. 19-cr-323-JSR (S.D.N.Y. July 17, 2020).

minimum of distress and expense to the end of his case.  The burdens the government imposed should weigh in Mr. Mones' favor.

Taking into account all features of Mr. Mones' case, his life, and the punishments meted in other similar cases and suffered by Mr. Mones already, the sentence not greater than necessary to serve the purposes of sentencing is 28 months' imprisonment.

## ARGUMENT

### I.     Mr. Mones' Personal History And Characteristics Are Exceptional

Considering the defendant's history fulfills the "elementary principle of weighing the good with the bad" and putting the "immediate misconduct . . . in the context of [the defendant's] overall life hitherto," at the "moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).  Mr. Mones' background and his character are exemplary.

### A.     Mr. Mones' Personal History

Mr. Mones was born in 1968.  He had a stable, working class childhood growing up in Caracas, Venezuela, where his parents had settled after fleeing Francisco Franco's regime in Spain. Ex. A, Ltr. 6 (Gladys Carmen Coro Alonzo).[5]  As a young child, Mr. Mones had "liked airplanes and everything related to them," as his mother puts it.  *Id*.  While enrolled in his third year at

---

[5] Letters from Mr. Mones' family are annexed as Exhibit A to the submission entitled "Letters of Support for Victor Mones Coro."  Letters from others are annexed as Exhibit B to that submission, and the letter of Mr. Mones himself is Exhibit C.  Certified English translations are provided with letters written in Spanish.  With the exception of Mr. Mones' letter and one of the two letters submitted by his daughter Estefania, all letters were written before the onset of the COVID-19 and before the government's late discovery productions delayed Mr. Mones' sentencing.  Exhibits designated by number are exhibits to this memorandum.

college, Mr. Mones told his parents that he wanted to pursue his dream of flying, and his mother put together funds for Mr. Mones' pilot training.

By the time he obtained his pilot's license, at the age of 22, Mr. Mones had met his future wife, Radmil Malaver, known as "Milly," a doctor preparing to specialize in pediatrics. The pair married in 1990 and began raising their daughter, Estefania. Mr. Mones became a co-pilot for Klaus Meyer, who ran a multinational company called Meyer Productos Terapeuticos (Meyer Therapeutical Products). By proving himself to a "demanding" boss, *See* Ex. B, Ltr. 19 (Klaus Meyer (the son)), he worked his way up to becoming Mr. Meyer's chief pilot.

By the late 1990s, however, Hugo Chavez had become Venezuela's president. Amidst the growing insecurity and street violence in that country, Dr. Mones was stabbed in the abdomen during an attempted carjacking. Ex. A, Ltr. 1 (Radmil Mones). On another day, strangers tried to kidnap Estefania, likely to seek a ransom. *Id.*

Alarmed and dismayed at Venezuela's trajectory under Chavez' leadership, Mr. Mones convinced his wife to leave their home country, and they departed after their second daughter, Lorein, was born in 1999. Newly settled in Boca Raton, Florida, Mr. Mones continued working for Mr. Meyer. When his boss was diagnosed with metastatic colon cancer in 2011, Mr. Mones arranged for all of Mr. Meyer's family to travel to Germany where Mr. Meyer was in a hospital ICU. *See* Ex. B, Ltr. 18 (Karin C. Meyer). He later flew Mr. Meyer to the Dominican Republic, where Mr. Meyer wished to pass away. *Id.*

Dr. Mones has described that she received her husband's "unconditional support" after moving to the United States, when she was deeply depressed at leaving Venezuela and thus necessarily her family and profession. Ex. A, Ltr. 1. When Mr. Mones was away for work, he would call her from other continents using satellite phones if he needed to. *Id.* Within ten years

of arriving in the U.S., the couple were proud that their daughter Estefania was attending college in St. Augustine, Florida.  Mr. Mones and his wife became U.S. citizens in 2011.

After Mr. Meyer passed away, Mr. Mones started a private air charter services company he named "American Charter Services" because it fulfilled his American dream.  ACS began brokering flights in 2010, and by meeting rigorous FAA requirements, obtained over time the ability to operate larger private jets.  At its peak, ACS employed about 13 full-time staff.  By early 2017, when the OFAC designations issued, Mr. Mones' family was also thriving.  Estefania was enrolled in graduate studies and engaged to be married, and Lorein was studying at Flagler College.

**B.      Mr. Mones' Characteristics**

Over three dozen friends and family have written letters that uniformly support Mr. Mones and establish that excepting the crimes to which he pled, Mr. Mones has lived an entirely law-abiding life, is crushed by his remorse, and will not commit another crime.

**1.      Mr. Mones' Devotion To His Family**

Many letters praise the wonderful, close-knit family that Mr. Mones heads.  Dr. Mones describes that from their first days together, 30 years ago, her husband was "always . . . thinking of our family's well-being." Ex. A, Ltr. 1.  "[O]ffer[ing] our daughters a better future," by working tenaciously and raising them well, was always the couple's overriding objective.  *Id*.

Mr. Mones has been a caretaker for his extended family.  For his mother, aged 81, who lives in Spain, he has arranged housing and improved her home after her husband suffered a stroke, again when he passed away, and again after she developed osteoarthritis.  *See* Ex. A, Ltr. 6 (Gladys Carmen Coro Alonzo).  Mr. Mones funded his sister-in-law's son's (successful) treatment for leukemia when he was a young child.  *See* Ex. B, Ltr. 13 (Omagdys Teresita Malaver Espinoza). He sent school supplies to his distant relatives Andrea and Leopoldo Ochoa during their childhoods

in Venezuela and then supported their "crazy dream" of moving away to The Netherlands.  Ex. B,

Ltrs. 20 & 21.  Since studying in Europe, the Ochoa siblings have been able to work at Unilever

and British Tobacco.  *Id*.

As the PSR reports, Mr. Mones has used his time in prison to "think critically about his

actions," PSR ¶¶ 85, 86, and as Mr. Mones has put it, to confront the "shame of my selfishness

and ego."  *See* Ex. C.  His daughter Estefania regards her father as a "hero" because of the way he

has persevered and retained hope despite debilitating depression and remorse, being imprisoned

without family or social contact, and contracting and recovering from COVID-19 while scared and

alone.  *See* Ex. A, Ltrs. 2 & 3.  According to Estefania, Mr. Mones has stayed fully focused while

imprisoned on repenting and making amends for his offense.  Ex. A, Ltr. 3.  Daughter Lorein has

been devastated and her studies and well-being disrupted by her father's arrest.  She feared even

to see her father in prison, thinking she might encounter a different person in that surrounding.

*See* Ex. A, Ltr. 4.  But she has found that her father remains "humble," "loving," and committed

to becoming "the absolute best version" of himself.  *See* Ex. A, Ltr. 4.

## 2.    Mr. Mones' Kindness And Generosity Toward Others

Mr. Mones' instinctive generosity has also enabled those outside his family to endure life

crises and change their lives for the better.  As examples:

- Mr. Mones sent boxes of food, household goods, and stationery to Daniel Tatoli in Venezuela when he was a child there.  Mr. Tatoli is now at university in Buenos Aires, Argentina.  *See* Ex. B, Ltr. 30.

- Over 15 years ago, Mr. Mones gave Jonathan Burls some used wheel assemblies, which Mr. Burls refurbished and sold at a $40,000 profit.  The successor to the company launched by those profits now has two locations and employs about 50 people.  *See* Ex. B, Ltr. 3.

- After Jorge Luis Salazar Burger lost his construction company in Venezuela, Mr. Mones helped him buy and run a pizza restaurant in Florida.  According to Mr. Salazar, Mr. Mones always "give[s] [his friends] the push, the advice, the love in

the moment we have needed it without asking for anything in return." *See* Ex. B, Ltr. 25.

- Mr. Mones offered a desk at ACS to Beatriz Alarcon's father when he was diagnosed with terminal cancer, so that her father could commute to an office daily and enjoy "a sense of purpose" while undergoing treatment and before he passed away. *See* Ex. B, Ltr. 1.

- Mr. Mones invited Antonio Marmo and his daughter into their Florida home for three months when the Marmos left Venezuela. Maria Alessandra is now a college graduate working in California in the entertainment industry. Mr. Marmo owns a medical equipment company and credits "the unconditional support" given by the Mones family for his success. *See* Ex. B, Ltrs. 14 & 15.

- Sloane Talton, a friend of Lorein Mones, recounts that when her father, a former FBI agent, passed away from ALS, Mr. Mones treated her as if she was "a daughter of his own," asking after her mental health and offering financial support. *See* Ex. B, Ltr. 29.

Mr. Mones has always gone beyond sympathizing to acting. There are many other letters in Exhibit B that express gratitude and wonder at Mr. Mones' selflessness.

### 3. Mr. Mones' Good Character, Responsible Nature, And Work Ethic

Mr. Mones' friends affirm his values and character unreservedly, even knowing of his arrest and plea. Jared Stark, a graduate of Georgetown University Law Center and the managing partner of the law firm that was ACS' corporate counsel, is "proud to write as Victor's friend," and states that Mr. Mones is "truly selfless and caring in a way that exemplifies the best of human nature." *See* Ex. B, Ltr. 27. To Eric Castillo, Mr. Mones is "truly a stand-up guy, full of love and morals," and a friend to call "once a week for advice on family, business and everyday life." *See* Ex. B, Ltr. 5.

Colleagues have described that Mr. Mones attained high regard in the private aviation industry before his arrest, because of his hard work and professionalism. *See* Ex. B, Ltr. 10 (Cesar Larez, a U.S. commercial pilot) (here and in Venezuela, "Victor is recognized . . . as an extremely hard working, honest and responsible person"); Ex. B, Ltr. 12 (Daniel Lundy) (Mr. Mones was

"the consummate professional pilot," "highly respected" by "fellow crew members, support staff, aircraft owners and passengers"); Ex. A, Ltr. 5 (son-in-law Ryan Grannis) (at conferences, "people would flock to Victor as if he was a celebrity.  [He] was adored by everyone in the aviation industry").  Mr. Mones began his career as an exceptional pilot and perfectionist in all he did.  *See* Ex. B, Ltr. 10 (Cesar Larez) (Mr. Mones was "very strict in his work, making sure that everything in the operation was perfect"); Ex. B, Ltr. 19 (Klaus Meyer) (Mr. Mones had an "impeccable" record including of carefully safeguarding the safety of his passengers).

### 4. Mr. Mones' Exemplary Conduct And Work In Prison

Mr. Mones has also been exceptionally caring and responsible in prison, despite the terrible struggles of being incarcerated during a pandemic.  Mr. Mones has read voraciously and has taken every course offered at the MCC.  Alexander Martinez, an MCC corrections officer, came to know Mr. Mones while discussing books he delivered.  He states that "I learned that he has a good and giving heart," and praises Mr. Mones as a "respectful," helpful inmate.  *See* Ex. B, Ltr. 16.

Before the COVID-19 pandemic, Mr. Mones helped other prisoners by comforting them when they were despondent, or by providing socks or a water cup from commissary.  *See* Ex. A, Ltr. 2 (Estefania Mones).  After he recovered from COVID-19 himself, he bought medications for other inmates who needed them.  *See* Ex. A, Ltr. 3 (Estefania Mones).  Mr. Mones expresses in his letter his gratitude to his cellmates and "bunkies" who have helped him in return.  *See* Ex. C.

Mr. Mones was assigned to work in the MCC laundry soon after he recovered from COVID-19.  His supervisor rated his work "outstanding" in every category and described Mr. Mones as an "excellent worker" and "self motivator."  Ex. 2.

## 5.    Mr. Mones' Long Commitment To Charitable Acts

Mr. Mones also has a long track record of engaging in charitable acts and organizing others to do so, not for "public approval, social media posts, or fanfare," but because he wants to help. *See* Ex. B, Ltr. 28 (Steven Stoliker).

Multiple letter writers have praised, for example, Mr. Mones' work after Hurricanes Maria and Irma struck Puerto Rico to help organize Christmas parties there for over 100 children identified by special needs schools and anti-bullying organizations.  Mr. Mones gave the name "American Smile Plane" to ACS' charitable efforts for children.  In 2017, ACS staff flew toys they had collected to San Juan and hosted the party dressed as Santa and his elves.  *See, e.g.*, Ex. B, Ltrs. 24 (Manuel Ruanova), 7 (George Diaz), 6 (Noemi Corporan Cedeno), & 26 (Diana Sotillo Sarmiento).[6]  In 2018, ACS again contributed over $10,000 worth of flight time and toys to a holiday party arranged by local non-profit organizations.  *See* Ex. B, Ltr. 26 (Diana Sotillo Sarmiento).  Photographs of the two events are annexed hereto as Exhibit 3.

ACS supported Joe DiMaggio's Children's Hospital in donating a flight to a recovering cancer patient who dreamed of flying like Amelia Earhart.  From 2014 to 2018, Mr. Mones donated flights to Vital Flight, an organization that gives plane rides to children who are ill or who have special needs.  *See A Special Day for Special Kids*, VITAL FLIGHT, http://vitalflightkidsday.org (last visited Aug. 27, 2020).  ACS sponsored events in 2017 and 2019 for First Tee, a Florida organization that teaches young people values through golf.  *See* Ex. B, Ltr. 2 (Jack Bloomfield).

---

[6] *See Toys Delivered to Children in Puerto Rico*, NBC NEW YORK, (Dec. 22, 2017, 4:57 AM), https://www.nbcnewyork.com/on-air/as-seen-on/toys-delivered-to-children-in-puerto-rico_new-york/380877/.

In June 2015, Mr. Mones donated two days of flying time to an ultimately unsuccessful search for two teenagers reported missing while fishing off the Florida coast.[7]

Mr. Mones and his wife regularly have sent food, clothing, donations, and personal hygiene items like shampoo, soap, and toothpaste to Catholic churches and orphanages in Venezuela, where rampant inflation and scarcity make such items hard to come by.[8]

Mr. Mones' overall record of charity supports the observation of one letter writer that "if there were more people like the American Smile Plane team this world would be a different place." *See* Ex. B, Ltr. 24 (Manuel Ruanova).

Mr. Mones' life, other than his crime, has been exemplary, including in its values and achievements.

## II.     The Nature And Circumstances Of The Offense Weigh Against A Term Of Incarceration Of Longer Than 28 Months' Imprisonment

Mr. Mones knows that he exhibited terrible, selfish judgment in evading sanctions. He has promptly (and now twice) has accepted responsibility, alone among the many defendants.  His crimes also had important mitigating characteristics.

Most centrally, despite his case being predicated on OFAC's designation of his co-defendants as "kingpins," the government has never alleged that Mr. Mones ever laundered money

---

[7] *See* Elisha Fieldstadt, *Capsized Boat Found in Search for Boys Missing Off Florida Coast*, NBC News (July 26, 2015, 12:57 PM), https://www.nbcnews.com/news/us-news/families-teens-missing-florida-coast-offer-100-000-reward-n398606.

[8] *See* Ex. B, Ltr. 23 (Norelis Rodriguez, director of orphanage on Margarita Island); Ex. B, Ltr. 11 (Father Marcos Linares of the Catholic archdiocese and parish of Our Lady of the Peace in Caracas); *See* Ex. B, Ltr. 17 (Nancy Martinez, coordinator of shelter for special needs children in Venezuela).

or aided drug transactions.  He did not do so.  Mr. Mones also did not ferry contraband of any sort or illegally transport bulk cash.[9]

Mr. Mones has lived and worked in the U.S. for two decades; his sole criminal conduct was arranging private passenger flights for El Aissami and Lopez Bello, knowing that it was illegal to do so after their designations.[10]  It appears that before this case, in the two decades that the Kingpin Act has been in effect, there has been only one  defendant who was  charged with evading that Act, without *also* being charged with distributing drugs or engaging in money laundering, or conspiring to do so.  The Kingpin Act charges were later dismissed in that case.[11]  The availability of civil and administrative sanctions under the Kingpin Act[12] suggests that Mr. Mones has suffered a special punishment and shaming.  He has amply promoted the goal of deterrence simply by being criminally charged.

---

[9] This Court stated in denying bail in March 2020 that Mr. Mones was a danger to the community because he has "a history of participating in illegal transfers of money."  Order, ECF No. 73, at 2 (Mar. 27, 2020).  The government has conceded, however, including in correspondence with the USPO, that Mr. Mones did not plan or execute any illegal bulk cash transfer.  It never contended in opposing bail that Mr. Mones was a danger to the community.

[10] Notably, the fifth superseding indictment in this case, filed on March 26, 2020, ECF No. 67, re-charged El Aissami and Lopez Bello, and added defendant Joselit Ramirez Camacho, *without* adding any narcotics trafficking charges against *any* of these individuals.  This is despite the fact that OFAC's naming of El Aissami and Lopez Bello as "specially designated narcotics traffickers," two years earlier, had served as the very basis for the illegality of Mr. Mones' continued dealings with them.  Also on March 26, 2020, Maduro and Colombian FARC leaders were charged in a single indictment with participating in a 20-year "narco-terrorism" conspiracy, *United States v. Maduro Moros*, No. 11-cr-205-AKH (S.D.N.Y. Mar. 26, 2020), ECF No. 11; Mr. Mones is not implicated in any of that alleged conduct.

[11] The defendant served no time.  *United States v. Li*, No. 13-cr-112-CM (S.D.N.Y. Feb. 15, 2013), ECF No. 13; *Id*. at ECF No. 24 (Sept. 30, 2014); *see also id*. at ECF No. 4 (Oct. 26, 2012).

[12] *E.g.*, 21 U.S.C. § 1906(b) (authorizing civil fines of up to $1,000,000 for violations of the rules and regulations issued under the Kingpin Act).

As is common in sanctions evasion conspiracies, the charged conspiracy involved planning, deception, and concealment.   El Aissami and Lopez Bello had been legal and longstanding clients of ACS and other South Florida-based air charter operators, including Mr. Marin and his company My Jet Saver, before OFAC designated them in February 2017.   After the designations, Mr. Mones and the other operators continued arranging flights but discontinued flights to and from the United States.  Mr. Mones took steps like avoiding referencing the designees in ACS recordkeeping.   His clients continued to pay (when they paid) by wire transfers, using companies with names that could not easily be associated with them.[13]  DHS signed up Mr. Marin as a Confidential Source in November 2017, and thereafter Mr. Marin reported the activity in which he was engaging, with the OFAC designees and others in Venezuela, Mr. Mones, and co-defendant Alejandro Miguel Leon Maal ("Leon Maal"), who was an employee of Mr. Mones until 2018 and the owner of his own flight services company, SVMI Solutions.  In about a dozen calls he consensually recorded, Mr. Marin discussed with Mr. Mones or Leon Maal future plans, and often  the difficulty of receiving payment from the Venezuelan designees.

Mr. Mones' offense, however, did not have common features of other sanctions evasions crimes.  For example, the evasion conspiracy did not require recruitment since the South Florida-based brokers, as well as the pilots hired to fly the designees, simply continued to do so, while taking more care not to be detected.  The brokers often called on each other when fulfilling requests by the designees or their associates in Venezuela to obtain the specific aircraft requested.  The

---

[13] Mr. Mones was occasionally paid with declared cash that Leon Maal and one of the other operators, Journey Aviation, brought into the United States.  *See* PSR ¶ 34.  No representative of Journey Aviation was ever charged.

pilots were mainly independent contractors with their own companies, matched to clients and aircraft, depending on the client requests and the pilot's availability.

Mr. Mones was not motivated by any shared political (or other) agenda with the designees or a foreign government, as is the case in other sanctions cases. Instead, he continued arranging flights for El Aissami and Lopez Bello because he feared financial ruin. Before 2017, Mr. Mones had fallen into the habit of pre-paying the costs of the flights he brokered for the designees.[14] The designees also owed Mr. Mones aircraft management fees, with the result that at the time they were designated, they owed Mr. Mones millions of dollars. Mr. Mones believed that cutting his clients off would mean losing "everything I had worked for," *see* Ex. C, and jeopardizing the employment of a dozen of his employees.

The flights Mr. Mones brokered mainly involved leisure trips taken by his clients' families and friends—for example, to vacations in Venezuela or the Caribbean or to sporting events. Mr. Mones knew that the trips occasionally combined business or work, but El Aissami and Lopez Bello did not confide in Mr. Mones about their work. The flights Mr. Mones brokered for El Aissami were within Venezuela and tailed off beginning in May 2018.[15] For Lopez Bello, Mr.

---

[14] Mr. Mones typically made a 10-20% commission on the flights he brokered, which cost from tens of thousands of dollars to hundreds of thousands of dollars. Mr. Mones, however, routinely pre-paid for his clients the fees charged by the operator when Mr. Mones hired an operator other than ACS to provide the aircraft and/or the pilot for the flight.

[15] Relying on facts provided by the government, the PSR makes reference to texts in which Mr. Mones was asked by co-defendant Joselit Ramirez Camacho, another Venezuela government official who routinely requested flights on El Aissami's behalf, to help arrange a flight for El Aissami to Russia in January 2019. PSR ¶ 32. What is omitted is that Ramirez Camacho cancelled his request, with the result that El Aissami did not travel to Russia (as far as Mr. Mones knows) until Leon Maal arranged a flight, without Mr. Mones' participation, the following month. PSR ¶ 33 (referring to flight arranged by Leon Maal).

Mones brokered flights throughout the conspiracy, mainly within Venezuela or to or from the Caribbean, and far less frequently to Europe or Russia.

Finally, Mr. Mones did not provide any unique service.  The designees could easily and legally have used a non-U.S. broker (and sometimes did).  It was likely Mr. Mones' practice of letting them fly on credit that led El Aissami and Lopez Bello to continue to use ACS after they were designated.

### III.    The Court Should Reject The Guidelines Range Predicated On Applying A Leadership Enhancement

#### A.    The Guidelines Range Calculated By The USPO

Among the factors that the court must consider is the Guidelines sentencing range.  18 U.S.C. § 3553(a)(4).  Here, the USPO's sentencing recommendation of 30 months' imprisonment implicitly acknowledges that even the Guidelines range it adopted should not weigh heavily in determining Mr. Mones' sentence.  After grouping the Counts (which in any event refer to the same sanctions evasion scheme), it adopted the following calculation:

1) Use of U.S.S.G. § 2M5.1 as the "most analogous guideline" for purposes of the offense, under U.S.S.G. §§ 1B1.2(a) and 2X5.1.

2) A base offense level of 26 because "national security controls" were evaded, within the meaning of Section 2M5.1(a)(1).  A level of 14 would have applied "otherwise." U.S.S.G. § 2M5.1(a)(2).

3) A four-level upward adjustment under U.S.S.G. § 3B1.1(a) because the defendant was an organizer or leader of criminal activity that involved five or more participants and was otherwise extensive.

4) A three-level downward adjustment for acceptance of responsibility, under U.S.S.G. § 3E1.1(a) and (b).

At CHC I, the total offense level of 27 yields a range of 70 to 87 months' imprisonment.

**B.     The Objection To Imposition Of A Leadership Enhancement**

In the calculation, Mr. Mones contests only the four-level leadership enhancement, on the ground that he was at most an average participant in the charged conspiracy.

As demonstrated by Exhibit 1—the chart showing the survey of Iran sanctions cases in the last five years in which a non-cooperating defendant was sentenced in any district under Section 2M5.1—the government seldom even seeks a role enhancement in sanctions evasions cases. This is despite the fact that most such cases, by their nature, involve conduct carried out by multiple people in different countries and that many violators were leaders of companies here or abroad who (unlike Mr. Mones) led and benefitted from the cross-border schemes. Of the 23 cases listed in Exhibit 1, in only four did the government seek any role enhancement, and in only one did the court impose a role enhancement, of two levels. The Guidelines range that courts almost uniformly applied to the defendants listed in the chart who pled guilty (all of whom were first-time offenders) was 46 to 57 months' imprisonment—the applicable range under Section 2M5.1 *absent any* role adjustment.

In this case, the government even offered pilot Michols Orsini Quintero ("Orsini Quintero") a two-level minor role *reduction*. *See* Ex. 4 (Plea Offer).[16] If the government regards Orsini Quintero to be a minor player, Mr. Mones, as a broker, cannot fairly be deemed more than an average participant.

The PSR concluded, as had been argued by the government, that Mr. Mones nonetheless "led" or "organized" others and thus applied an enhancement of four levels. PSR ¶ 58 and p. 33. This ignores two basic tenets, however. First, it is the government's burden to prove five or more

---

[16] This exhibit was also ECF No. 159-1, Exhibit A to Orsini Quintero's Reply in Support of Bail, dated December 10, 2020.

"criminally responsible" participants to justify imposition of a leader/organizer enhancement, U.S.S.G. § 3B1.1, n.1, and to prove sanctions evasion, the relevant state of mind is knowledge of illegality, not just wrongfulness. *See* Jan. 4, 2021 Plea Tr., ECF No. 170, at 13:24-14:1, 14:11-20, 22:7-17 (government concessions of same). The government has not proven five "criminally responsible" participants by this definition.[17] The PSR appears to assume, for example, that pilots and ACS employees knew that they were violating U.S. sanctions law. PSR at p. 33. It never applies the standard of a "knowing" state of mind and ignores that the government expressly conceded that ACS employees "unknowingly" furthered the scheme. PSR ¶ 24.

Second, to maintain that Mr. Mones "led" or "organized" others disregards that "leadership" or even "management" must involve the exercise of "independent judgment and discretion" consistent with meaningfully greater culpability. *United States v. Murad*, 954 F. Supp. 772, 789 (D. Vt. 1997); *see also* U.S.S.G. § 3B1.1, n.4 & Backgr. (listing "exercise of decision making authority" as relevant factor and noting that role adjustment should increase with organization size and "the degree of the defendant's responsibility").[18] Not every instruction or direction exercises independent judgment. In *Murad*, the court found that the factory manager in a company at which a bankruptcy fraud was initiated and committed was not a "leader" or

---

[17] *E.g.,* Sentencing Transcript at 27:11-28:16, *United States v. Parsa*, No. 14-cr-710-RA (S.D.N.Y. May 20, 2016), ECF No. 68 (declining to apply role enhancement because the government failed to prove five or more participants who were criminally responsible for conduct to which defendant pled or whose conduct was governed by U.S. law).

[18] *See also United States v. Burgos*, 324 F.3d 88, 92-93 (2d Cir. 2003) (reversing role enhancement for owner of a check-cashing business alleged to have led or managed another who stole the checks because the business owner did not exercise "control" over the thief and did not recruit him; each served the other); *United States v. Caballero*, 93 F. Supp. 3d 209, 219-20 (S.D.N.Y. 2015) (in drug conspiracy, for a defendant to identify a potential purchaser of wholesale quantity of drugs and direct a co-defendant to buy a plane ticket enabling defendant to travel to the site of potential sale failed to establish that defendant "guided events or directed others" so as to qualify as a leader or manager of the drug conspiracy).

"manager" although he directed other employees to divert assets and hide records, because "within the context of the conspiracy" he acted at the direction of others. *Id*. at 788-89. In *Attila*, the court imposed a minor-role adjustment for a deputy bank manager who undoubtedly supervised others in illegally transferring billions of dollars but was also "following orders in large measure" from the bank manager. *Attila* Tr. at 10:19-11:14.

Here, the "context of the conspiracy" includes a sphere of operations in Venezuela, including co-defendants El Aissami, Lopez Bello, and Ramirez Camacho (another Venezuelan government official and El Aissami's right hand man), who were clearly far more powerful than any knowing or unknowing participant in the United States. The government cannot have it both ways; it charged the OFAC designees, and thus Mr. Mones' "decision-making authority" is judged in relation to them. It was El Aissami, Lopez Bello, Ramirez Camacho, and other associates in Venezuela who dictated the date, time, and flight destinations/plan of each and every flight—often the aircraft and pilot as well. In other words, while Mr. Mones may have carried out planning and logistics (for example, to prepare invoices or arrange ground transportation, or to ensure that a pilot knew where to meet his passengers), in doing so he was not exercising independent judgment consistent with higher-than-average culpability, much less "leadership" culpability. Mr. Mones did not lead, in particular, the pilots, who sometimes received flight requests directly and were matched to flights based on client requests or their own technical qualifications and availability. Mr. Mones did not tell any pilot how to fly; his text chains with them show the sharing of logistical information—fuel usage, take-offs, and landings. *See* Ex. 5.

Co-defendant Leon Maal, who was on ACS' payroll until September 2018, also was not led or organized by Mr. Mones but was instead a classic "rogue employee." Beginning in early 2018, Leon Maal arranged through Ramirez Camacho to start his own brokering and aircraft

management service for El Aissami, without including Mr. Mones.[19]  Mr. Marin joined Leon Maal

in that side business and arranged for El Aissami to pay them through millions in undeclared bulk

cash flown by Mr. Marin into the United States in three trips from July 2018 to January 2019.[20]

On July 26, 2018, the day Mr. Marin carried out the first of those trips, Leon Maal boasted to Mr.

Marin that their side business had made "a million dollars in two months," a sum far outstripping

the brokering that anyone else, including Mr. Mones, was doing.[21]  Leon Maal even opened a

second business called On Approach, with bank accounts outside of the United States, to facilitate

his side business with El Aissami.

The "nature" of Mr. Mones' "participation," U.S.S.G. § 3B1.1, n.4 (listing factors), was

also inherently inconsistent with leadership.   As described further below, ████████████

███████████████████████████████████████████.  This is not a signifier of

enhanced culpability or greater danger to the public.  No need to "recruit" arose, *see id.*, for the

reasons discussed above.  The pilots often importuned Mr. Mones—not the other way around—

for opportunities to work.  And finally, Mr. Mones enjoyed no "fruits of the crime," *see id.*, and

instead *lost* money on the services the designees requested and benefitted from.

Because Mr. Mones was a participant with negligible discretion who was informing on his

co-defendants and never gained from his offenses, no leadership enhancement should be applied

and the Guidelines range should be deemed to be 46 to 57 months' imprisonment.

---

[19] *See* Exhibit 6, at 21, 23, 41 (consensually recorded call on February 2, 2018 in which Leon Maal
tells Mr. Marin that "Tango Echo Alpha," or El Aissami, had authorized him and "J.L.," or
Ramirez Camacho, to set up an operation at Maiquetía, the Caracas airport, which was "our own
thing," and in which he was not involving Mr. Mones).

[20] El Aissami left the office of Vice President in June 2018 and became the Minister of Industry
and National Production.  In April 2020, he became Venezuela's Oil Minister.

[21] *See* Exhibit 7, at 9, 15 (consensually recorded call on July 26, 2018).

IV.    **The Court Should In Any Event Vary Downwardly From The Guidelines Range And Impose A Sentence Of 28 Months' Imprisonment**

Including for all the reasons just stated regarding the nature of Mr. Mones' participation, whether or not a role enhancement is applied, the Guidelines range greatly overstates the seriousness of the offense.

A.    **A Sentence Of Longer Than 28 Months' Imprisonment Would Create Unwarranted Sentencing Disparity**

A consideration that weighs strongly in favor of a downward variance to 28 months' imprisonment is the necessity of "avoid[ing] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6) (stating that court "shall consider" potential for disparities); *see also United States v. Toohey*, 132 F. App'x 883, 887 (2d Cir. 2005) (vacating sentence where district court failed "under § 3553(a)(6) to consider sentencing disparity by reference to similarly situated defendants nationwide").

The lack of gradation in Section 2M5.1 is well known.  The guideline has only two base levels: 26 (if "national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded" or "the offense involved a financial transaction with a country supporting international terrorism") or 14 ("otherwise").  U.S.S.G. § 2M5.1 (a)(1), (2).  It is accepted that a "national security control" includes any export control that exists because of national security concerns.[22]  As a result, nearly all calculations under Section 2M5.1 start with the base offense level of 26.

---

[22] *See, e.g.*, *United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir. 1997) (evading a "national security control" requires only that the defendant make an export that violates a statute enacted to deal with a threat to national security; the export itself need not threaten national security); *United States v. Elashyi*, 554 F.3d 480, 508-09 (5th Cir. 2008) (following *McKeeve*).

22

That same base offense level has been applied in Mr. Mones' case, on the rationale that the Kingpin Act is a "national security control." U.S.S.G. § 2M5.1(a)(1)(A). But level 26 applies equally to far more serious conduct in which Mr. Mones did not engage: "financial transactions with countries supporting international terrorism," including the evasion of "controls relating to the proliferation of nuclear, biological, or chemical weapons or materials." U.S.S.G. § 2M5.1 (a)(1)(A), (B). Unlike many other Guidelines, Section 2M5.1(a)(1) also has no calibration for purpose, value, duration, impact, or any other metric.

That applying Section 2M5.1(a)(1) overstates the gravity of Mr. Mones' offense becomes particularly clear upon consideration of sentences imposed for similar conduct.

The most serious and frequently prosecuted type of export controls violations are those involving prohibited exports to Iran, a country deemed a state sponsor of international terrorism.[23] The comparison is from the outset a conservative, apples-to-oranges analogy,[24] but to assist the Court, counsel compiled Exhibit 1, a chart surveying sentences imposed in reported cases across the country, in five years ending September 15, 2020, in which the defendant pled guilty to conspiring to violate the International Emergency Economic Powers Act ("IEEPA") and the Iran Transactions and Sanctions Regulations, and was sentenced under Section 2M5.1. *See* Ex. 1. The

---

[23] The U.S. government has also designated North Korea, Syria, and Cuba as state sponsors of terrorism. U.S. DEP'T OF STATE, STATE SPONSORS OF TERRORISM (2021).

[24] Counsel has only been able to identify two instances where defendants were sentenced for violating the Kingpin Act, without having pled guilty additionally to drug dealing or money laundering crimes. In both cases, the defendants received sentences of probation. *See* Amended Judgment, *United States v. Arango*, No. 18-cr-20565-MGC (S.D. Fla. Jan. 16, 2019), ECF No. 55; Amended Judgment, *United States v. Sanchez*, No. 07-cr-20587-ASG (S.D. Fla. July 6, 2009), ECF No. 80.

survey excluded defendants who received more than the equivalent of three levels of a downward departure for cooperating.[25]

The defendants in the 23 Iran export control cases listed in Exhibit 1 were all first-time offenders, like Mr. Mones.  The average of *all* sentences imposed in the 23 cases is 28.9 months. Courts downwardly varied in nearly all cases—20 of the 23—and the average downward variance was more than 24 months.  In more than a third of the cases, sentences of 20 months' imprisonment or less were imposed.  The only two instances in which a sentence of four years' imprisonment or more were imposed involved defendants who exported goods to Iran in mass volumes with clear military or nuclear applications.[26]

Variances granted in this District reinforce this analysis.  *United States v. Atilla* was the biggest sanctions evasion case ever prosecuted in the country, according to the government. Under the benchmark it sets, a sentence for Mr. Mones of greater than time served would be highly disparate and unfair.  Mr. Atilla, a deputy bank manager, was convicted after a four-week trial of

---

[25] Public reporting of criminal cases by U.S. agencies like DOJ, OFAC, and the Department of Commerce, Bureau of Industry and Security, aided the identification of reported Iran sanctions cases.  Cases fitting the other criteria of the survey were excluded if there was insufficient public information about the sentencing factors set forth in the chart.

[26] Counsel also carried out a similar survey of Iran sanctions cases over the past ten years; that average was slightly higher—just over 30 months. Data kept by the U.S. Sentencing Commission substantiates that judges overwhelmingly impose below-Guidelines range sentences in cases in which Section 2M5.1 is the primary Guideline—not limited to cases involving Iran sanctions.  The Sentencing Commission reported that in 2019, in 14 cases Section 2M5.1 was the primary guideline applied, and of those only three sentences imposed were within the range.  U.S. Sentencing Comm'n, *2019 Annual Report and Sourcebook of Federal Sentencing Statistics*, Table 32, p. 92 (2019).  In the other 11 cases, the court downwardly departed (including for cooperation) seven times and varied four times. *Id.*  In 2018, the Commission reported 17 cases in which Section 2M5.1 was the primary guideline applied, and only one in which a sentence within the Guidelines range was imposed.  U.S. Sentencing Comm'n, *2018 Annual Report and Sourcebook of Federal Sentencing Statistics*, Table 32, p. 92 (2018).  In the other sixteen cases, the court either varied or downwardly departed.  *Id.*

conspiring to commit money laundering and bank fraud as well as to violate sanctions against Iran.[27] On top of facilitating billions in prohibited money transfers, representing revenues of Iran's petroleum industry, for five years,[28] Mr. Atilla perjured himself at trial.[29]  Among the Court's rulings was to impose a two-level minor role deduction, rather than the three-level managerial enhancement the government sought, because Mr. Atilla had been "following orders in large measure from his boss," and was even "reluctant" at times.[30]  Judge Berman also downwardly varied from a Guidelines range of 97 to 121 months' imprisonment to impose a sentence of 32 months' imprisonment.[31]  The District Judge noted the "excessively punitive" Guidelines range driven by the high dollar value,[32] Mr. Atilla's relatively minor role, the fact that he gained nothing from his offenses, and his otherwise blameless life and good conduct in prison.[33]

In *United States v. Sarvestani*, Judge Gardephe downwardly varied from a Guidelines range of 57 to 60 months' imprisonment to impose a sentence of 30 months' imprisonment. *Sarvestani* Tr. at 26:15-16, 28:1-2.  The judge described the defendant as a "highly sophisticated international businessman" who used two companies he owned and managed in the UAE, for "many years," to procure satellite equipment to send to Iran, "a nation that actively supports terrorism." *Id.* at 22:6-23, 23:18-24:16.  The defendant did so via multiple mid-points, including

---

[27] *Atilla* Tr. at 30:18-31:2, 61:13-17, 79:13-17.  Atilla had been incarcerated for 14 months at the time. *Id.* at 30:18-19.

[28] Decision and Order at 1-2, 12-13, *Atilla* (Feb. 7, 2018), ECF No. 493.

[29] *Atilla* Tr. at 13:5-8, 56:15-57:7.

[30] *Id.* at 9:20-23, 10:19-12:5, 20:22-21:2.

[31] *Id.* at 22:17-24, 49:8-15, 79:13-19.

[32] *Id.* at 20:8-17, 25:19-25.

[33] *Id.* at 20:22-25, 29:25-30:5, 36:22-24, 37:23-38:3, 46:22-25.

Hong Kong, Dubai, and Malaysia, while concealing the true destination of the equipment and causing his employees to lie to the U.S. Customs Service. *Id.* at 22:12-16, 23:5-14.

While accepting that each case is unique, Judge Gardephe noted being influenced by a consideration of "typical sentences." He stated:

> I will grant a variance in large part based on the case law defense counsel has submitted, setting forth typical sentences in cases involving export violations. Many of the cases cited by the defense involved equipment that could be used for military use.

> The sentences imposed in these cases were, nonetheless, shorter than the guidelines range applicable here.

*Id.* at 27:1-7. Judge Gardephe found the volume of examples and the weight of the authority to be convincing. He reasoned:

> Now, I do tend to agree with the government's point that it is difficult to apply all of the cases that are cited by the defense, because we don't know all of the relevant circumstances . . . .

> But there are enough cases cited to me to make me believe that I should give him weight in determining whether a variance is appropriate here.

*Id.* at 27:8-19 (referencing Defendant's Sentencing Memorandum, dated July 31, 2013, ECF No. 20, and Exhibit 10 thereto).

The mandatory consideration of cases involving similar conduct demonstrates that a sentence of higher than 28 months' imprisonment would lead to an impermissible sentencing disparity. Mr. Mones' offense was significantly less serious than that of defendants Atilla and Sarvestani. Other defendants in this district and others have served shorter sentences than the term Mr. Mones has already served although they profited from trans-shipping goods and technology to Iran for years, including with knowledge that they would be put to use in Iranian weaponry or by the Iranian military. *See* Ex. 1 (Rows 1, 11, 14, 19).

**B.     Numerous Other Factors Demonstrate That A Sentence of 28 Months'
Imprisonment Is Ample To Serve The Purposes of Sentencing**

Multiple considerations unique to Mr. Mones' case, which the PSR appears not to take into

account, also demonstrate the appropriateness of a term of not more than 28 months.

**1.     Mr. Mones** ████████████████████████████████████
████████████████████████████████

A highly unusual factor that weighs strongly in favor of leniency ███████████████████
████████████████████████████████████████████████
████████████████████████████████████.

Mr. Mones did not share any political or criminal aims of his clients or the Venezuelan

government, as the PSR suggests in factual recitals that dwell on the backgrounds and misconduct

of various Venezuelan (and Colombian) officials, irrespective of whether Mr. Mones even knew

them.[34]  Mr. Mones was ██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[34] These recitals were furnished by the government.  PSR ¶¶ 14-15, 18-21.  Because of the way in
which the expedited PSR was prepared, the government is already aware of Mr. Mones' objections
to the PSR, but Mr. Mones also plans to file those objections.

---

[35] The first chain, via WhatsApp, is one document in which counsel has combined the text of the chats with the images of the attachments that remain accessible ███████████████████████████ .

██████████████████████████████████████████████████████

██████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

### 2. The Conditions Of Mr. Mones' Confinement Have Been Extreme And Included Contracting COVID-19 At The MCC

Mr. Mones has also suffered extreme punishment already—the functional equivalent of a term much longer than the calendar time he has served to date. *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (holding conditions of confinement can serve as a ground for a downward departure if sufficiently extreme).

Mr. Mones has been detained at the MCC during three lockdowns—for an entire year as a result of the COVID-19 pandemic, in the summer of 2019 following Jeffrey Epstein's suicide, and in the spring of 2020 while the MCC searched for a smuggled weapon.  In each of these lockdowns, the level of tension and anxiety in the prison escalated, Mr. Mones lost email and phone privileges, and he was deprived of showers, warm food, sleep, and personal belongings.  For fully the last

---

[36] The DHS agent who questioned Mr. Mones in June 2018 reinforced Mr. Mones' impression that ███████████████████████████████████████████.  During that questioning, which took place in Florida after Mr. Mones returned from attending a golf tournament in the Dominican Republic at Lopez Bello's invitation, ████████████████ ████████████████████████████.  The same DHS agent was also present for Mr. Mones' post-arrest questioning and acknowledged their earlier meeting and ██████████████████████████████████████.

year, Mr. Mones has not been able to have a single social visit or to see any family member.  He has lived in an overcrowded facility where prisoners and guards alike have feared the circulation of a deadly virus while being unable to distance or freely obtain personal protective equipment.

Mr. Mones also suffered the worst of the possible eventualities.  He came down with COVID-19 and suffered from it for several weeks, without treatment other than over-the-counter medications and "isolation" in an ice-cold cell with a cellmate.[37]  Mr. Mones and his cellmate in general population began experiencing symptoms at the end of March, after another inmate in his unit tested positive.  Mr. Mones' requests for help were ignored until his condition further deteriorated, and MCC staff determined to move him into "isolation" with another sick cellmate.

Mr. Mones endured nearly three weeks in isolation, suffering fever, chills, cough, loss of taste, body aches—all without treatment other than drugstore medication.  MCC personnel told him that he was assumed to have COVID-19, because testing was unavailable, and that the MCC could not provide care beyond non-prescription drugs if his condition worsened.  Mr. Mones feared that he would die alone and without being able to speak to his family.  Two weeks passed during Mr. Mones' isolation without him being given the chance to inform his loved ones of his condition. They waited for his call every hour of those two weeks.

In recognition that conditions at the MCC and MDC during the "once-in-a-century" pandemic have exacted "a price" on inmates beyond that ever contemplated, including because of a "well-founded fear" of risk of illness and death,[38] courts in this District have granted downward

---

[37] MCC records substantiate Mr. Mones' illness and its duration, his isolation, and his treatment.

[38] *United States v. Mcrae*, No. 17-cr-643-PAE, 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021) ("a day spent in prison under extreme lockdown" and in fear of contracting COVID-19 "is, unavoidably, experienced as more punishing" than "an ordinary day in prison"); *see also Aracena*

variances of months and even years to defendants housed in those prisons, whether they contracted

COVID-19 or not.[39]   Mr. Mones' sentence too should take into account that the conditions of his

confinement have not remotely been what would be deemed humane in ordinary times.   This fact

also sets Mr. Mones apart from other defendants sentenced in non-COVID times under Section

2M5.1.

   **3.      Mr. Mones Helped To Expose That Mr. Marin, The Long-time
             Confidential Source, Was Unreliable**

       An extraordinary mitigating circumstance is that Mr. Mones exposed the government's

long-time Confidential Source, Mr. Marin, to be an unreliable liar.   DHS' acceptance of Mr. Marin

---

Tr. at 32:1-16, 36:22-37:11; Sentencing Transcript ("*Carrillo Berber* Tr.") at 24:9-17, *United States v. Carrillo Berber*, No. 18-cr-703-PAC (S.D.N.Y. June 11, 2020), ECF No. 28; *Cirino* Tr. at 11:9-15.

[39] *See, e.g.*, Sentencing Transcript at 12:14-16, 15:21-16:24, 19:5-19, *United States v. Sanchez-Reyes,* No. 19-cr-502-DLC (S.D.N.Y. July 24, 2020), ECF No. 32 (giving "substantial recognition" to "onerous" MCC conditions during COVID-19 pandemic and varying from range of 70-87 months to 48 months in cocaine trafficking case); Sentencing Transcript at 6:5-11; 7:10-17, 27:13-20, *United States v. Espinal*, No. 19-cr-622-DLC (S.D.N.Y. Aug. 6, 2020), ECF No. 54 (granting 10-month downward variance and stating that sentence would have fallen within range of 70 to 87 months were it not for MDC conditions); *Aracena* Tr. at 13:11-15, 22:2-19, 30:24-25, 32:1-16, 37:17-18, 38:15-22, 39:1-2 (varying from range of 30-37 months to time served plus one day (approximately six months) where illegal reentry was "far less malignant than most [cases]" and defendant contracted COVID-19 in MCC, thereby enduring "dreadful," "arduous" conditions that "no one would wish . . . on any other human being"); Sentencing Transcript at 24:3-6, 40:12-24, *United States v. Mitchell*, No. 13-cr-752-KPF (S.D.N.Y. Aug. 5, 2020), ECF No. 50 (imposing 21-month sentence for violation of supervised release instead of 24-month sentence solely because of "unsafe and inhumane" conditions at the MCC); *Carrillo Berber* Tr. at 23:8-10, 23:19-22, 24:9-25:2 (varying downward from a range of 46-57 months to impose a sentence of time served (approximately 22 months) because defendant acted as heroin courier and in light of MDC conditions including lack of visitation); Sentencing Transcript at 12:23-25, 20:4-13, 20:22-22:8, 22:22-23:10, *United States v. Casillas*, No. 19-cr-863-VLB (S.D.N.Y. May 4, 2020), ECF No. 27 (varying from range of 15-21 months to time served (approximately five months) in illegal reentry case in light of multiple factors including MCC conditions); *Casillas*, No. 19-cr-863-VLB (S.D.N.Y. Dec. 20, 2019), ECF No. 10 (memo endorsement denying bail); *Cirino* Tr. at 8:23-9:7, 11:9-21 (court imposing 10-month sentence in Hobbs Act robbery case and noting that it would have imposed a sentence of "probably a year to a year and a half" but for "harshness" of BOP conditions "that is not the norm" in light of COVID-19).

as a source, in late 2017, had marked the inception of its investigation.  It was Mr. Marin who acted in lockstep with Mr. Mones and Leon Maal in the U.S.-based brokering activities.  He consensually recorded calls with the then-targets.  He had his own extensive relations among Venezuelan officials.  The government entrusted Mr. Marin (inadvisedly, as it turned out) to transport the illegal bulk transfers of a total of millions of dollars.  AUSAs debriefed Mr. Marin multiple times after Mr. Mones' arrest, in 2018, 2019, and in 2020.

The about-face of the government placing Mr. Marin under arrest in September 2020, based on three counts of lying to federal agents, was the result of questions posed by Mr. Mones about facts the agents and AUSAs long overlooked.  Mr. Mones pointed out that according to the DHS agents' own contemporaneous reports and photographs of the July 2018 bulk cash transfer, several hundred thousand euros had gone missing while Mr. Marin alone was flying them into the United States.  As the complaint against Mr. Marin lays out, *see United States v. Alejandro Javier Marin*, 20 Mag. 9491, when DHS agents and AUSAs thereafter confronted him about the missing euros, Mr. Marin lied.  Mr. Marin claimed that an associate of El Aissami's, Juan Ferro, had taken the missing euros in Venezuela.  Mr. Marin also falsely maintained that he had never succeeded in getting funds back from Mr. Ferro; in fact, Mr. Ferro had wired $140,000 to Mr. Marin in January 2020 and Mr. Marin had kept the money without reporting it to his handlers or to AUSAs.  The $140,000 were crime proceeds and thus the property of the government.

In opposing Mr. Mones' motion for discovery sanctions, the government acknowledged that it was "when defense counsel raised fair questions regarding the source's conduct" that it sought "to address and investigate the inquiries and produc[e] any related evidence."  ECF No. 143, at 1 (Nov. 24, 2020).  It also stated that it was "[a]s a result of that investigation" that "the source was arrested and is now incarcerated."  *Id.*

In opposing Mr. Marin's bail, the government argued that Mr. Marin was a liar who "just cannot be trusted" not to flee.  Presentment Hearing Transcript ("*Marin* Tr.") at 23:18-24:13, 26:15-27:1, *United States v. Alejandro Javier Marin*, 20 Mag. 9491 (S.D.N.Y. Nov. 10, 2020), ECF No. 6.  Mr. Marin's counsel has since reported that Mr. Marin will plead guilty.  Mr. Mones should receive credit for helping the government and the courts by demonstrating that a source on whom the government had relied for years was in fact not worthy of trust.

### 4.  Mr. Mones Suffered The Extraordinary Burdens Of The Government's Sixteen Late Discovery Productions

Finally, it is undisputed that the government made 16 productions of discovery, in a total volume of over 6.7 terabytes, *after* Mr. Mones initially pled guilty, in November 2019.[40]  This Court determined that the burdens of those late productions would be considered at sentencing, *See* ECF No. 160 (Dec. 14, 2020) (denying discovery motion "as premature without prejudice to renewing his motion in the sentencing context").  Those burdens also warrant a downward variance.

The prejudice suffered by Mr. Mones and his family as a result of the massive and piecemeal late productions have been profound.  Had the government timely produced its discovery, before he first pled guilty, Mr. Mones would have considered it once and all together.  Instead, Mr. Mones was forced to expend time and money, including expert fees, reviewing huge volumes of "supplemental" discovery, while imprisoned and without the ability to sit with counsel.  His sentencing was delayed for a half year following his first plea, and then his guilty plea was withdrawn and re-negotiated, because of what this Court called the "chunk" of information of

---

[40] *See* Exhibit 10, also Exhibit A to Motion for Discovery Sanctions, ECF No. 137-1 (Nov. 11, 2020).  As a rough measure, the Federal Judicial Center has stated that a terabyte is the equivalent of 500 billion written pages of text.  Manual for Complex Litigation (Fourth) § 11.446 (2004).

which he had been deprived.  October 28, 2020 Conference Transcript at 13:11-13, ECF No. 131. The motions triggered by the government's late discovery further delayed disposition of his case and depleted Mr. Mones' family's resources.

It was beyond abnormal for Mr. Mones to have to review libraries-full of electronic discovery produced as late as a year after he first pled guilty.  And as recounted above, it was government derelictions in failing to question discrepancies in its own proof that led to late document productions regarding that source.  Pleading guilty ordinarily enables a defendant to progress to the end of his or her case with the least distress and the least  expense.  The fact that Mr. Mones was utterly deprived of those benefits is another reason for sentencing leniency.

## **CONCLUSION**

By multiple measures and benchmarks, including punishments already suffered, Mr. Mones is deserving of a sentence that will return him to being a productive member of society. The sentence that is no longer than necessary to serve the purposes of sentencing and therefore just, *see* 18 U.S.C. § 3553(a), is 28 months' imprisonment.

Dated:   February 20, 2021
         New York, New York

Respectfully submitted,

Christine H. Chung
CHRISTINE H. CHUNG PLLC
14 Murray Street, #236
New York, New York 10007
Telephone: (917) 685-0423
christine@thechunglawoffice.com

Samidh Guha
George M. Barchini
PERRY GUHA LLP
35 East 62nd Street
New York, New York 10065
Telephone: (917) 674-5383
sguha@perryguha.com
gbarchini@perryguha.com

*Attorneys for Defendant Victor Mones Coro*

35